# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT
2/22/21

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

4027 Fairbanks Avenue, Dayton, Ohio 45402

Case No. 3:21-mj-68

Kimberly Jolson

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Southern District of Ohio, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 841(a)(1) | possession with intent to distribute controlled substances |
| 21 USC s. 846 | conspiracy to distribute/possess with intent to distribute controlled substances |
| 18 USC s. 924(c) | possession of a firearm in furtherance of a drug trafficking crime |

The application is based on these facts:

See Attached Affidavit of Robert Buzzard

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Robert M. Buzzard*
Applicant's signature

Robert Buzzard, SA of the FBI
Printed name and title

Sworn to before me and signed in my presence via facetime.

Date: February 22, 2021

City and state: Columbus, Ohio

Kimberly A. Jolson
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Robert Buzzard, hereby duly sworn, declare and state:

### INTRODUCTION

1. I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), assigned to the Cincinnati Division, Dayton, Ohio Resident Agency. I therefore am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878. Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510.

2. I have served as an FBI SA since January 2002. I am currently assigned to the Cincinnati Division, Dayton Resident Agency and serve on the FBI's Southern Ohio Safe Streets Task Force (SOSSTF). Since 2002, I have participated in investigations involving narcotics trafficking and have received specialized training on the subject of narcotics trafficking and money laundering from the FBI. I have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions. Based on my training and experience – including my participation in the investigations referenced above – as well as discussions and interactions with other experienced FBI SA's, Task Force Officers ("TFO"), and narcotics investigators, I am familiar with the manner in which drug traffickers and their organizations operate within the United States. Based on my aforementioned training and experience, I am familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and as a result, knows the following:

   a. It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and beeper/pager services by using other person's names in order to avoid detection by law enforcement officials.

b. It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c. That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d. It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e. It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

f. It is common practice that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them.

g. It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h. That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i. When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

j. Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

k. It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their

associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

l. Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones.

m. Drug traffickers commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n. Drug traffickers frequently maintain hidden compartments within their residence and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o. The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

p. Drug traffickers frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

q. Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

r. I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.

## PURPOSE OF AFFIDAVIT

3. I make this affidavit in support of an application for search warrant at the following address:

a. 4027 Fairbanks Avenue, Dayton, Ohio 45402, including any outbuildings, garages, or sheds located on its curtilage (hereinafter "**Location 1**"). **Location 1** is described more fully in Attachment A, which is incorporated herein by reference;

4. As detailed more fully below, I submit that there is probable cause to believe that evidence of a crime as well as contraband, fruits of a crime or other items illegally possessed in relation to the following offenses exist and can be found inside **Location 1** – namely:

a. Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 841, and

b. Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 846.

c. Possession of Firearms in Furtherance of a Drug Trafficking Crime, in violation of Title 18, U.S.C., Sections 924(c)(1)(A) and 2.

5. A list of specific items to be seized from the premises described above is attached hereto as Attachment B, and Attachment B is incorporated herein by reference. Based on my

training and experience as well as the facts contained in the affidavit, I believe that there is probable cause to believe that the items listed in Attachment B will be found at the premises described above. I have not included every detail of the investigation, but only information necessary to establish probable cause that evidence associated with above-described drug trafficking and firearms offenses is located at **Location 1**.

## PROBABLE CAUSE

6. On or about January 25, 2021, I was contacted by an individual, hereinafter referred to as Confidential Source One (CS1). CS1 has provided me with truthful and reliable information in the past which has been corroborated by independent investigation. Information provided by CS1 has resulted in the seizure of illegal narcotics and led to the successful prosecution of drug traffickers. CS1 is not providing information in exchange for any consideration from prosecution. CS1 identified **Location 1** as a building utilized to store, package and sell illegal narcotics. Specifically, CS1 has personal knowledge that marijuana and prescription pills are being sold inside **Location 1**. CS1 knows drug buyers arrive at the address and enter a single door on the west side of the building to purchase illegal narcotics. CS1 also knew the address has a high volume of pedestrian foot traffic and vehicle traffic consistent with a drug stash location. CS1 identified Phillip Benson as the person who runs/operates **Location 1**. CS1 indicated that these activities were ongoing as of January 2021.

7. I am familiar with Phillip Benson from a prior FBI narcotics investigation and know Benson has three prior convictions in Montgomery County Ohio Common Pleas Court for Trafficking in Cocaine.

8. On January 30, 2021, the Dayton Police Narcotics Unit received a tip through the Crime Stoppers anonymous tip line concerning narcotics being sold inside **Location 1**.

Specifically, the tipster named a known individual, other than Benson, who utilizes **Location 1** to store large quantities of marijuana, crack cocaine, and various prescriptions pills. The tipster advised the known individual also sells marijuana, crack cocaine, and prescription pills out of **Location 1** and utilizes multiple other males armed with firearms to guard the narcotics.

9. Beginning on February 1, 2021, and continuing thereafter, FBI Task Force Officer Dustin Phillips and Dayton Police Department Narcotics Detective Sean Humphries began utilizing two individuals (hereinafter referred to as CS2 and CS3) to make controlled purchases of marijuana from inside **Location 1**. CS2 has provided TFO Phillips with information in the past, which has been verified by independent investigation and proven truthful and reliable. CS3 has provided Detective Humphries with information in the past, which has been verified by independent investigation and proven truthful and reliable.

10. On February 1, 2021, TFO Phillips met with CS2 at a pre-determined location. CS2 was provided Dayton Police Department narcotics buy funds to purchase an amount of marijuana from **Location 1**. CS2 and CS2's vehicle were searched for contraband prior to traveling to **Location 1**, and none were found. Thereafter, CS2 traveled to **Location 1**, and I watched as CS2 entered the address through a single door on the west side of the building. Following the purchase of marijuana, CS2 exited **Location 1** and met back up with TFO Phillips. CS2 provided TFO Phillips with the marijuana purchased and described what she/he observed inside **Location 1**. CS2 reported entering the address and observing an unknown black male guarding the side door with a shotgun/long gun. A second black male was sitting behind a desk inside the address. The subject sitting at the desk was armed with a handgun (in a shoulder holster) and was taking and filling orders for marijuana. CS2 handed the individual seated at the desk Dayton Police buy funds and received marijuana in return. CS2 advised there was a third

black male armed with an assault rifle standing guard behind the desk during the marijuana purchase.

11. Before, during, and after the aforementioned controlled marijuana purchase, I conducted physical surveillance at **Location 1**. I noted multiple individuals arrive and enter the west side door and then leave in a short period of time. Based on my training and experience, the activity at **Location 1** was consistent with high-volume narcotics sales. I also noted multiple surveillance cameras affixed to the exterior of **Location 1**. Two of those cameras were mounted around the west side entrance door. I know through my training and experience that narcotics traffickers utilize surveillance cameras to alert them to the presence of adversaries, to include law enforcement officers.

12. On February 1, 2021, Detective Humphries met with CS3 at a pre-determined location. CS3 was provided Montgomery County Regional Agencies Narcotics and Gun Enforcement (RANGE) Task Force buy funds to purchase an amount of marijuana from **Location 1**. CS3 and CS3's vehicle were searched for contraband prior to traveling to **Location 1**, and none were found. Thereafter, CS3 traveled to **Location 1**, and I watched as CS3 entered the address through a single door on the west side of the building. Following the purchase of marijuana, CS3 exited **Location 1** and met back up with Detective Humphries. CS3 provided Detective Humphries with the marijuana purchased and described what she/he observed inside **Location 1**. CS3 reported entering the address and observing an unknown black male guarding the side door with a long gun. A second black male was sitting behind a desk inside the address. The subject sitting at the desk was armed with a handgun (in a shoulder holster) and was taking and filling orders for marijuana. CS3 handed the individual seated at the desk RANGE Task Force buy funds and received marijuana in return. CS3 advised there were additional unknown

males inside the address at the time of the marijuana purchase.

13. On the afternoon of February 1, 2021, Dayton Police Patrol Officer Vince Carter drove past **Location 1** while on routine patrol. Officer Carter observed an unknown black male wearing a white t-shirt and shoulder holster (for a handgun) standing near the west side entrance door to **Location 1**. Upon seeing Officer Carter's marked police car, the unknown male walked back inside **Location 1** via the west side entrance door.

14. On February 5, 2021, CS2 conducted a second controlled/surveilled purchase of marijuana from **Location 1**. CS2 met with TFO Phillips prior to the controlled buy and was provided Dayton Police Department narcotics buy funds. CS2 was searched for contraband, and none was found. CS2 proceeded to **Location 1** and entered the location via the west side door. CS2 again provided a black male individual the Dayton Police Department buy funds in exchange for an amount of marijuana. CS2 left **Location 1** and met with TFO Phillips. CS2 provided TFO Phillips with the marijuana and informed TFO Phillips about what she/he observed inside **Location 1** during the controlled buy. CS2 advised there were two males standing guard and armed with firearms during the narcotics transaction. Additionally, there was another male subject seated at the desk inside who provided CS2 with the marijuana.

15. On February 15, 2021, CS2 conducted a third controlled/surveilled purchase of marijuana from **Location 1**. CS2 met with TFO Phillips prior to the controlled buy and was provided Dayton Police Department narcotics buy funds. CS2 was searched for contraband, and none was found. CS2 proceeded to **Location 1** and entered the location via the west side door. Once inside, CS2 provided an unknown black male buy funds in exchange for marijuana. CS2 did not observe armed guards inside **Location 1** during the transaction.

16. On February 19, 2021, CS3 conducted another controlled purchase of marijuana from **Location 1**. Detective Humphries met with CS3 at a pre-determined location prior to the buy and provided CS3 RANGE Task Force buy funds to purchase an amount of marijuana from **Location 1**. CS3 and CS3's vehicle were searched for contraband prior to traveling to **Location 1**, and none were found. Thereafter, CS3 traveled to **Location 1,** and I watched as CS3 entered the address through a single door on the west side of the building. Following the purchase of marijuana, CS3 exited **Location 1** and met back up with Detective Humphries. CS3 provided Detective Humphries with the marijuana purchased and described what he/she observed inside **Location 1**. CS3 reported the west side entrance door to **Location 1** remains locked and customers have to knock to be let in. After knocking, an unknown white male answered the door and allowed CS3 inside. The unknown white male was armed with an assault-style firearm with a "drum magazine." CS3 handed a different individual seated at a desk inside **Location 1** RANGE Task Force buy funds and received marijuana in return. CS3 advised there were additional unknown males inside the address at the time of the marijuana purchase.

## CONCLUSION

17. Based on the facts set forth in the Affidavit, I believe there is probable cause that evidence associated with the above listed drug trafficking and firearm offenses are located within **Location 1** and surrounding curtilage of **Location 1**.

*Robert M. Buzzard*
Robert Buzzard
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me on this 22nd day of February, 2021.

*Kimberly A. Jolson*
Kimberly A. Jolson
United States Magistrate Judge

Attachment A

**Location 1:** The place to be searched is 4027 Fairbanks Avenue, Dayton, Ohio 45402 and the surrounding curtilage. 4027 Fairbanks Avenue., Dayton, Ohio is a single-story commercial building constructed of red brick and concrete block. The front of the building faces south and the numbers "4027" appear on a red sign attached to the front fence around the property and a black mailbox attached to the same fence. 4027 Fairbanks Avenue., Dayton, Ohio 45402 is further depicted in the following photograph.



## ATTACHMENT B

### PROPERTY TO BE SEIZED

The items to be searched for and seized are evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. §§ 846 and 841(a)(1) including, but not limited to:

A. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D. Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E. Electronic equipment such as surveillance video and related equipment, pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

F. United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H. Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

I. Illegal drugs, and other materials, paraphernalia and/or equipment and tools used in the drug trade.

J. Firearms and ammunition.